# United States Court of Appeals for the Federal Circuit

---

**THOMAS H. BUFFINGTON,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2020-1479

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-4382, Judge Amanda L. Meredith, Judge Joseph L. Falvey Jr., Judge William S. Greenberg.

---

Decided: August 6, 2021

---

DORIS JOHNSON HINES, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, Washington, DC, argued for claimant-appellant. Also represented by ANDREA GRACE KLOCK MILLS; BARTON F. STICHMAN, National Veterans Legal Services Program, Washington, DC.

SHARI A. ROSE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by JEFFREY B. CLARK, MARTIN F. HOCKEY, JR., ROBERT

EDWARD KIRSCHMAN, JR.; BRIAN D. GRIFFIN, SAMANTHA ANN SYVERSON, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

RICHARD ABBOTT SAMP, New Civil Liberties Alliance, Washington, DC, for amicus curiae New Civil Liberties Alliance.  Also represented by ADITYA DYNAR.

———————————

Before MOORE, *Chief Judge*\*, LOURIE and O'MALLEY, *Circuit Judges.*

Opinion for the court filed by *Chief Judge* MOORE.

Dissenting opinion filed by *Circuit Judge* O'MALLEY.

MOORE, *Chief Judge.*

Thomas H. Buffington appeals a final decision of the United States Court of Appeals for Veterans Claims. *Buffington v. Wilkie*, 31 Vet. App. 293 (2019) (*Veterans Court Op.*).  Under 38 C.F.R. § 3.654(b)(2), the Veterans Court denied Mr. Buffington an earlier effective date for recommencement of his disability benefits after periods in which he received active service pay.  *Id.* at 296.  Mr. Buffington contends § 3.654(b)(2) conflicts with and is an unreasonable interpretation of 38 U.S.C. § 5304(c).  Because we hold § 3.654(b)(2) reasonably fills a statutory gap, we affirm.

## BACKGROUND

Mr. Buffington served on active duty in the United States Air Force from September 1992 until May 2000.  After leaving active duty service, Mr. Buffington sought disability benefits.  The Department of Veterans Affairs (VA) found that Mr. Buffington suffered from service-connected tinnitus, rated his disability at ten percent, and awarded

———————————

\*   Chief Judge Kimberly A. Moore assumed the position of Chief Judge on May 22, 2021.

him disability compensation.  In 2003, Mr. Buffington was recalled to active duty in the Air National Guard.  He informed the VA of his return to active service, and the VA discontinued his disability compensation.  *See* 38 U.S.C. §§ 5112(b)(3), 5304(c).  In 2004, Mr. Buffington completed his term of active service.  Later that year, he was again recalled to active duty, serving until July 2005.  It was not until January 2009, however, that Mr. Buffington sought to recommence his disability benefits.  The VA determined Mr. Buffington was entitled to compensation effective on February 1, 2008—one year before he sought recommencement.  *See* 38 C.F.R. § 3.654(b)(2) (setting effective date for recommencement of compensation, at the earliest, one year before filing).

Mr. Buffington filed a Notice of Disagreement, challenging the VA's effective-date determination.  The VA Regional Office issued a Statement of the Case rejecting his challenge and providing further reasoning for the February 1, 2008 effective date.  Mr. Buffington then appealed to the Board of Veterans Appeals, which affirmed the VA's decision.  He next appealed to the Veterans Court.  That court held that § 3.654(b)(2) was a valid exercise of the Secretary of Veterans Affairs rulemaking authority and was not inconsistent with 38 U.S.C. § 5304(c).  *See Veterans Court Op.*, 31 Vet. App. at 300–04.  Mr. Buffington appeals.  We have jurisdiction under 38 U.S.C. § 7292(a).

## DISCUSSION

Title 38 codifies a complex statutory scheme aimed at providing benefits to veterans.  For example, it provides veterans with a general entitlement to compensation "[f]or disabilit[ies] resulting from personal injur[ies] suffered . . . in [the] line of duty" during a period of war, § 1110, or during peacetime, § 1131.  As a shorthand, Congress refers to those disabilities as service-connected disabilities.  *See* 38 U.S.C. ch. 11 ("Compensation for Service-Connected Disability or Death").  And it refers to benefits paid as a result

of service-connected disabilities as compensation. *Id.* § 101(13). Title 38 also provides pensions for veterans who served in a period of war and for veterans who appear on the Army, Navy, Air Force, or Coast Guard Medal of Honor Roll. *See id.* §§ 1511–25.

To receive disability benefits, a veteran must apply. *Id.* § 5101(a)(1)(A) ("[A] specific claim in the form prescribed by the Secretary . . . must be filed in order for benefits to be paid or furnished to any individual under the laws administered by the Secretary."). Based on that application, the VA must determine whether the veteran has a general entitlement to disability benefits—for example, because he has a service-connected disability. If a veteran has a service-connected disability, the VA must assign him a disability rating, which corresponds to the amount of compensation paid. *See, e.g.*, *id.* § 1134 (setting rates of peacetime disability compensation by reference to § 1114, which sets those rates for wartime disability). It must also set the effective date for the award of benefits. *Id.* § 5110. Occasionally, under the statutory framework, benefits must be reduced or discontinued. When a veteran returns to active service, for example, he cannot receive both active service pay and disability compensation. *Id.* § 5304(c). When a reduction or discontinuance is in order, § 5112 dictates how the VA must determine the effective date for that reduction or discontinuance.

This appeal requires us to interpret VA-administered statutes to determine the effective date for recommencing (as opposed to awarding or discontinuing) service-connected disability benefits once a veteran leaves active service.[1] The Secretary of Veterans Affairs has answered that

---

[1]    Mr. Buffington argues the question at issue should be framed as whether the VA can effect a forfeiture of benefits. But that framing assumes the interpretive conclusion.

interpretive question, promulgating 38 C.F.R. § 3.654(b)(2) through notice-and-comment rulemaking. In such circumstances, we apply the two-step framework set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[2] Step one asks "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter," and we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," we proceed to step two of the *Chevron* framework, at which we determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We must defer in the face of statutory silence because, "as a general rule, agencies have authority to fill gaps where the statutes are silent." *Nat'l Cable & Telecom. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 339 (2002) (citing *Chevron*, 467 U.S. 843–44); *see also Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019).

I

At step one, we hold that Congress left a gap in the statutory scheme. Section 5304(c) bars duplicative compensation when a veteran receives active service pay:

> Pension, compensation, or retirement pay on account of any person's own service shall not be paid to such person for any period for which such person receives active service pay.

---

[2]    Amicus New Civil Liberties Alliance (NCLA) argues the *Chevron* framework should not apply. Neither party adopts this position, *see* Appellant's Br. at 7 ("This question is governed by the two-step framework of *Chevron* . . . .") and Appellee's Brief at 12, and we do not find it persuasive given the facts and arguments presented here.

38 U.S.C. § 5304(c).  Thus, a veteran cannot receive both service-connected disability payments and active service pay.  And Congress set the effective date (start date) for discontinuing disability benefits based on active service:

> The effective date of a reduction or discontinuance of compensation . . . by reason of receipt of active service pay or retirement pay shall be the day before the date such pay began.

38 U.S.C. § 5112(b)(3).  But Congress did not establish when or under what conditions compensation recommences once a disabled veteran leaves active service.  Nowhere in § 5304(c)'s plain terms or in the broader statutory structure did Congress speak directly to that issue.

The "any period" phrase in § 5304(c) does not set the effective date for recommencing disability benefits.  Of course, the word period refers to a length of time: here, the time during which a veteran is receiving active service pay.  And that period has a beginning date—when active service compensation starts—and an end date—when active service compensation ends.  But § 5304(c) does not say compensation must cease *only* for that period.  Congress was silent regarding whether other conditions, such as timely filing of an application, could justify a later effective date for any recommencement of compensation.  Congress neither required nor prohibited consideration of such conditions.  And we must not read into § 5304(c) words that Congress did not enact—like reading "any period" as "***only*** any period."  *See Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").

Mr. Buffington argues, relying on statutory context, that his interpretation does not read "only" (or any other language) into § 5304(c).  He claims Title 38 obligates the VA to pay compensation for service-connected disabilities,

*see* 38 U.S.C. § 1131;[3] sets the effective date for those awards, *see id.* § 5110; and provides a limited exception for when payment is barred based on active service pay, *see id.* § 5304(c). Thus, to Mr. Buffington, "compensation runs parallel to the period of service: stopping on re-entry to active military service and restarting at discharge from active military service." Appellant's Reply Br. at 14–15 (internal quotation marks omitted).

Mr. Buffington's concessions throughout this case, however, undermine that position. In his opening brief, Mr. Buffington agreed the VA can "require that a veteran notify it that the veteran is no longer receiving active duty pay before benefits can be *paid*." Appellant's Br. at 32 (emphasis in original). That is, the VA can require a veteran to apply for recommencement of disability benefits. *See* 38 C.F.R. § 3.654(b)(2) (creating just such a requirement). And at argument, Mr. Buffington went further. Questioned about Mr. Buffington's admissions in his briefing, Mr. Buffington's counsel conceded that "the government can certainly require reapplication[,] . . . can require a veteran to appear for an additional medical exam[, and] . . . can reconsider the amount of disability compensation." *See* Oral Arg.[4] at 4:50–5:45. Implicit in that view is the understanding that § 5304(c) does not create a limited exception to a general entitlement to benefits. Instead, when a disabled veteran returns to active service, his disability benefits are discontinued. *See* 38 U.S.C. § 5112 (setting

---

[3]    Mr. Buffington cites 38 U.S.C. § 1110 for his general entitlement to compensation, which relates to wartime disabilities. But because Mr. Buffington did not serve during a period of war, *id.* § 1101(2), a different provision controls. *See id.* § 1131. Still, any differences between §§ 1110 and 1131 are immaterial for purposes of this appeal.

[4]    Available at http://oralarguments.cafc. uscourts.gov/default.aspx?fl=20-1479_05032021.mp3.

effective date for "discontinuance"). After leaving active service, the veteran can once again seek disability benefits, but nothing in the statutory scheme speaks to when or how those benefits are recommenced.

Mr. Buffington's interpretation would lead to impermissible surplusage, which is not present under the government's interpretation. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 500 (1998) (holding an interpretation was "impermissible under the first step of *Chevron*" in part because it created surplusage). Under Mr. Buffington's interpretation the word period in § 5304(c) would set both the date for discontinuing benefits and the date for recommencing benefits based on active service. Congress, however, already enacted a statute that sets the date for discontinuing benefits based on active service. *See* 38 U.S.C. § 5112(b)(3). Adopting Mr. Buffington's construction, then, would render § 5112(b)(3) superfluous.

To avoid reading language into § 5304(c) and rendering § 5112(b)(3) superfluous, we hold the statutory scheme is silent regarding the effective date for recommencing benefits when a disabled veteran leaves active service.[5] Since Congress has not "directly spoken to the precise question at issue," we must continue on to step two. *Chevron*, 467 U.S. at 842.

II

At step two, we ask "whether the agency's answer [to the question at issue] is based on a permissible construction of the statute." *Id.* at 843. Filling the statutory gap, the Secretary promulgated 38 C.F.R. § 3.654(b)(2). In

---

[5] Because we hold the statutory scheme is silent, we need not resolve the parties' dispute regarding the pro-veteran canon. *See Terry v. Principi*, 340 F.3d 1378, 1383 (Fed. Cir. 2003).

relevant part, that regulation defines the effective date for any recommencement of benefits after a disabled veteran leaves active service:

> Payments, if otherwise in order, will be resumed effective the day following release from active duty if claim for recommencement of payments is received within 1 year from the date of such release: otherwise payments will be resumed effective 1 year prior to the date of receipt of a new claim.

*Id.*

As a preliminary matter, Mr. Buffington challenges the Secretary's statutory authority to promulgate 38 C.F.R. § 3.654(b)(2). But the Secretary was within the scope of his authority "to prescribe all rules and regulations which are necessary or appropriate to carry out the laws administered by the Department and are consistent with those laws." 38 U.S.C. § 501(a). That authority gives the Secretary power to fill gaps in the veterans' benefits scheme. *See Contreras v. United States*, 215 F.3d 1267, 1274 (Fed. Cir. 2000) (holding grant of authority to promulgate regulations "necessary to the administration of a program" that an agency oversees allows the agency to fill gaps); *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (holding authorization for Secretary of Labor to "prescribe necessary rules, regulations, and orders" provided the Department of Labor "with the power to fill [explicit statutory] gaps"). Accordingly, the Secretary had power to fill the gap in § 5304(c) regarding the effective date of recommencement with a reasonable regulation.

And § 3.654(b)(2) is a reasonable gap-filling regulation. Section 3.654(b)(2) encourages veterans to seek recommencement of disability benefits in a timely fashion, but it always provides a veteran with some compensation. If a veteran seeks recommencement within a year of his release from active service, he is entitled to benefits effective on the day after he left service. If he seeks benefits later, he

is entitled to compensation effective one year before his filing date. By incentivizing early filing, § 3.654(b)(2) promotes the efficient administration of benefits, but it does not promote efficiency at all costs. Mr. Buffington does not explain how this incentive structure is unreasonable. As we have noted, "the VA is in a better position than this court to evaluate inefficiencies in its system." *Veterans Just. Grp., LLC v. Sec'y of Veterans Affs.*, 818 F.3d 1336, 1351 (Fed. Cir. 2016). It is likewise reasonable for the VA to require timely reapplication, since a disability may improve or worsen over time. *See* 38 C.F.R. § 3.654(b)(2) (providing that "[c]ompensation will be authorized based on the degree of disability found to exist at the time the award is resumed").[6]

## CONCLUSION

Because the VA reasonably filled a statutory gap when promulgating 38 C.F.R. § 3.654(b)(2), we must defer to that regulation. Because the Veterans Court recognized the statutory gap and afforded the VA's regulation appropriate deference, we affirm.

## **AFFIRMED**

### COSTS

No costs.

---

[6] Mr. Buffington argues that § 3.654(b)(2) leads to an absurd result because, in at least one case where the veteran never notified the agency of her active service and thus received duplicative benefits, that veteran was only forced to return the duplicative benefits. Appellant's Br. 43–46. Mr. Buffington's fairness argument does not bear on the reasonableness of § 3.654(b)(2), but rather on the VA's failure to require regulatory compliance in that case.

# United States Court of Appeals
# for the Federal Circuit

---

**THOMAS H. BUFFINGTON,**
*Claimant-Appellant*

**v.**

**DENIS MCDONOUGH, SECRETARY OF
VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2020-1479

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-4382, Judge Amanda L. Meredith, Judge Joseph L. Falvey Jr., Judge William S. Greenberg.

---

Decided: August 6, 2021

---

O'MALLEY, *Circuit Judge*, dissenting.

It is undisputed that Thomas Buffington suffers from tinnitus, arising from his active military duty in the United States Air Force from 1992 through May 2000. Because of that disability, he was awarded disability compensation, with an effective date corresponding to the end of his active duty service. It is also undisputed that, when he was called back to active duty in July 2003—and began receiving active duty pay—his disability payments ceased. And it is

undisputed that, when Mr. Buffington finished serving his country yet again in July 2005, he continued to suffer from tinnitus.  Despite his continuing disability, however, his disability payments were not restored until February 1, 2008.  The majority endorses the Department of Veterans Affairs' treatment of Mr. Buffington.  I do not.  I, thus, respectfully dissent.

The majority claims it reaches its conclusion by finding a "statutory gap" in those statutory provisions governing payments to veterans at step one of its *Chevron* analysis.  It claims it has found this gap without needing to determine whether the governing provision—38 U.S.C. § 5304(c)—is ambiguous.  Turning to step two of *Chevron*, it then finds that the VA acted reasonably when it filled that supposed gap with regulations (1) requiring a veteran to go through the process of reapplying for disability benefits and requalifying for the very benefits for which he was already deemed qualified; and (2) setting the effective date of the resumption of benefits by reference to that reapplication process, and not by reference to the end of his receipt of active duty pay.  I disagree on both steps of that analysis.

I.

A. There is no "statutory gap"

As noted, at *Chevron* step one the majority does not conclude that 38 U.S.C. § 5304 is ambiguous.  It, instead, finds that, while Congress made clear during what period disability payments cannot be paid, it forgot to mention when they would restart.  This oversight, according to the majority, gave the VA the right to legislate via regulation the time period and circumstances under which such payments would recommence—the right to fill the congressionally created "gap."

The majority puts the cart before the horse in its *Chevron* analysis.  Rather than apply traditional tools of statutory construction to determine whether there is an

ambiguity in § 5304(c), it fast-tracks past this step and finds what it believes is a statutory gap that the agency may fill. The Supreme Court made clear in *Chevron*, however, that step one always begins by asking whether the statute at issue is ambiguous. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). It is only after finding a statutory ambiguity that courts may consider the possibility that Congress delegated to an agency the power to fill a gap. *See United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488 (2012) ("*Chevron* and later cases find in unambiguous language a clear sign that Congress did *not* delegate gap-filling authority to an agency; and they find in ambiguous language at least a presumptive indication that Congress did delegate that gap-filling authority.") (emphasis in original). The majority may not avoid determining whether § 5304(c) is ambiguous. Instead, it must first focus on whether there is an ambiguity in the relevant statute, taking into account any purported statutory silence in the process.

But, a plain reading of the relevant portions of the governing statute and careful consideration of the context in which they appear demonstrate that there is no statutory gap to fill. Section 5304(c)'s text and context militate against finding an ambiguity in the statute. To begin, statutory silence does not always create a statutory gap for the purposes of *Chevron*'s step one analysis. It, instead, often indicates the "rather unremarkable proposition that sometimes statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.,* 556 U.S. 208, 223 (2009) (citing *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457 (2001)); *see also Burns v. United States*, 501 U.S. 129, 136 (1991) ("[N]ot

every silence is pregnant.") (citation omitted), *abrogated on other grounds by Dillon v. United States,* 560 U.S. 817 (2010).  Indeed, "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent." *Burns*, 501 U.S. at 136.  Here, congressional intent is not difficult to divine.

38 U.S.C. §§ 1110 and 1131 state that "the United States will pay to any veteran" compensation for service-connected disabilities.[1]  Section 5110 contains numerous provisions regarding precisely when such disability payments are to begin, and after which those payments "will" be paid.  Section 5110(a) of Title 38 establishes the general rule that effective start dates of veterans' benefits will not begin "earlier than the date of receipt" of the veteran's application for benefits.  38 U.S.C. § 5110(a)(1).  Section 5110 is subject to certain exceptions, all of which are designed to *increase* the benefits to veterans in certain circumstances.  *See, e.g.*, 38 U.S.C. §§ 5110(b)(1)–(b)(2) (establishing effective date based on variant of one-year look back period for disability benefits after veterans are discharged from active duty); *id.* § 5110(b)(3) (establishing a one-year look back period when veterans submit claims for increase); *id.* § 5110(b)(4) (establishing a one-year look back period when veterans submit claims for disability pension); *id.* § 5110(d) (establishing a one-year look back period for claims submitted for death, dependency, and indemnity compensation); *id.* § 5110(g) (establishing a one-year look back period for claims arising from liberalizing law or new administrative issue).  In other words, Congress knew how to set dates for

---

[1]     As the majority notes, Mr. Buffington's disability payments were authorized pursuant to 38 U.S.C. § 1131, not § 1110.  As the majority also notes, however, there is no material difference between the provisions as it relates to the issue before us.

commencement of benefits when it deemed it necessary to do so, and, when doing so, it always assured that benefits would commence sooner rather than later.

38 U.S.C. § 5304(c) is an exception to the continuous payment obligation, calling for a pause in such payments while a veteran is receiving active duty pay. Indeed, it calls for a pause in *all* retirement and pension benefits while active duty pay is received.[2] 38 U.S.C. § 5112(b)(3) provides that all such post-active duty payments shall cease the day before any active duty pay begins. While it is true that § 5304(c) does not mention a recommencement date, it is clear that Congress only wanted a veteran's benefits to discontinue for "*any period* for which such person receives active service pay." 38 U.S.C. § 5304(c) (emphasis added). While Congress did not explicitly state in § 5304(c) that disability and retirement benefits will recommence only upon active duty ceasing, it did not need to; the contrapositive of this statutory section says as much. *See id.* (noting that "any period" of active service pay will result in a loss of disability benefits). That § 5304(c) is silent on when benefits will "recommence" is of no moment. The plain text of Title 38 indicates that Congress intended for veterans' benefits to discontinue during "any period" of active service pay. Outside this "period," the veteran remains entitled to the benefits for which he originally qualified.

Reading § 5304(c) as the majority does means the veteran loses his original effective start date for disability benefits and must be assigned a later start date, depending on when he "reapplies" for benefits. *See* Maj. Op. at 7–8 ("[W]hen a disabled veteran returns to active service, his disability benefits are discontinued. . . . After leaving

---

[2] Technically, veterans have a choice to continue disability and other retirement payments during active duty *or* receive active duty pay. The point is that they cannot receive both.

active service, the veteran can once again seek disability benefits . . . .").     Indeed, because § 5112(b)(3), like § 5304(c), also applies to all disability compensation, dependency and indemnity compensation and pension payments, the majority's reading of § 5304(c) would mean that *none* of those payments would automatically recommence. That means that those veterans who return from temporary active duty would not only receive no active duty pay, but, absent strict compliance with 38 C.F.R. § 3.654(b)(2), would receive no disability benefits, no pension, and no other retirement compensation during at least some post-active duty period, despite previously having been deemed qualified for such payments. That cannot be right. As it relates to disability benefits specifically, it is not right because it flies in the face of § 1131's directive that disability payments will be paid once the criteria therefore is satisfied. Notably, the government does not contend that active duty pay continues until it receives notice that active duty has ended or a veteran has reapplied for his other benefits. As to these payments, the Secretary apparently has no problem giving the "any period" language in § 5304(c) its plain and ordinary meaning.

The broader context in which these provisions were enacted confirms the conclusion that disability payments should recommence effective the day after active duty pay ceases. According to the Supreme Court, Congress's solicitude towards veterans is "plainly reflected in the [Veterans Judicial Review Act ("VJRA")], as well as subsequent laws that place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 440 (2011). In legislating the VJRA, Congress noted that it "has designed and fully intends to maintain a beneficial non-adversarial system of veterans benefits." H.R. Rep. No. 100–963, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5782, 5794–95. Indeed, the VJRA is replete with provisions designed to make it easier for veterans to

obtain benefits and to challenge denial of such benefits. The development of this veteran-friendly scheme and its remedial nature was the very raison d'être for passage of the VJRA.

In addition to the VJRA, one such "subsequent law[]" Congress passed to favor veterans comprises the Veterans Appeals Improvement and Modernization Act of 2017 ("AMA"). Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115–55, 131 Stat. 1105 (codified in scattered sections of 38 U.S.C.). Section 5110(a)(2), which was enacted as part of the AMA, amended § 5110. *See id.* § (2)(*l*)(1), 131 Stat. 1110 (codified as amended at § 5110(a)). Prior to the AMA, effective dates for disability benefits were based on the "original claim, a claim reopened after final adjudication, or a claim for increase of [benefits]." 38 U.S.C. § 5110(a) (2012). The practical reality of this scheme meant that veterans who appealed their benefits claims by either reopening them or filing for an increase in benefits would be subject to the VA's "legacy appeals" process. Legacy appeals were notoriously fraught with lengthy wait times that risked greatly delaying a veteran's effective start date. *See* H.R. Rep. No. 115-135, at 4–5 (2017) (noting the increasing number of undecided VA legacy appeals and the long wait times for a final decision); *see also Legislative Hearing on the Veterans Appeals Improvement and Modernization Act of 2017 Before the H. Comm. on Veterans' Affs.*, 115th Cong. 15–16 (2017).

The AMA, however, amended § 5110(a) in two salient ways. First, § 5110(a)(1) now centered the effective start date of benefits around "initial" or "supplemental" claims. By no longer tying effective dates to when veterans reopened their claims or filed for increases in benefits, Congress signaled its desire for veterans to receive the *earliest* effective start date possible. Second, Congress added § 5110(a)(2), which states: "[f]or purposes of determining the effective date of an award under this section, the date of application shall be considered the date of the filing of

the initial application for a benefit *if the claim is continuously pursued*." 38 U.S.C. § 5110(a)(2) (emphasis added). Within this same subsection, Congress delineated various ways in which veterans could "continuously pursue[]" their claims and receive the earliest effective date possible. *Id.* § 5110(a)(2)(A)–(E). By effectively providing veterans with more options to "continuously pursue[]" their claims while receiving the earliest effective date possible, Congress again signaled its intention to safeguard effective start dates.

Nowhere in the AMA, VJRA, or Title 38 did Congress express an intention for disabled veterans to lose their original effective start dates upon return to active duty. Rather, the AMA demonstrates that Congress prioritized preserving a veteran's earliest possible effective start date. The majority's decision is therefore irreconcilable with the congressional intent espoused in the AMA because it risks veterans receiving later effective start dates than were originally assigned. I find it implausible that Congress wanted disabled veterans who reenter the service of their country to be required to "reapply" for the same benefits to which they previously were entitled, and also risk having their previous effective start dates superseded by a new, later date if they do not reapply within the narrow timeframe set forth in 38 C.F.R. § 3.654(b)(2).

The majority's reading of "any period" in § 5304(c) also defies logic. The majority appears to agree that § 5304(c) prohibits veterans from receiving disability pay during "any period" of active service pay. *See* Maj. Op. at 6 ("The 'any period' phrase in § 5304(c) . . . refers to a length of time: here, the time during which a veteran is receiving active service pay."). This is correct. Where the majority errs, however, is in its assertion that "§ 5304(c) does not say compensation must cease *only* for that period. Congress was silent regarding whether other conditions, such as timely refiling of an application, could justify a later effective date." *Id.* (emphasis in original). In legislating

§ 5304(c), Congress chose to use classic conditional logic: "any period" during which a veteran receives active service pay will result in the veteran not receiving disability benefits. 38 U.S.C. § 5304(c). Receiving active service pay, then, sufficiently guarantees the necessary condition of not receiving disability benefits. The majority's insistence that other sufficient conditions, such as "timely refiling of an application," could also guarantee the loss of disability benefits improperly imports surplusage into § 5304(c)'s text. "[I]n general, 'a matter not covered is to be treated as not covered'—a principle 'so obvious that it seems absurd to recite it.'" *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S. Ct. 1637, 1645 (2020) (citing A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012)). Where Congress creates express exceptions courts should not elaborate unprovided for exceptions into the text. *Reading Law* at § 8 (citing *Petteys v. Butler*, 367 F.2d 528 (8th Cir. 1966) (Blackmun, J., dissenting)).

To make matters worse, despite initially appearing to agree that § 5304(c) prohibits veterans from receiving disability pay during "any period" of active service pay, the natural consequence of the majority's interpretation contravenes the statutory text. In addition to receiving active service pay, the majority contends that "other conditions, such as timely refiling of an application, could justify a later effective date." Maj. Op. at 6. This means, then, that "any period" encompasses more than just the time period in which a veteran receives active service pay. Under the majority's reading of § 5304(c), "any period" must now encompass the period of active service pay *plus* the period in which the veteran has yet to reapply for benefits upon returning from active duty. As discussed above, "a matter not covered is to be treated as not covered." And, exceptions are to be deemed exclusive unless clear language to the contrary says otherwise. The majority errs by ignoring both of these principles of statutory construction.

### B. No "concessions" by Mr. Buffington's counsel justify the majority's statutory interpretation

The majority contends that the following "concessions" made by Mr. Buffington during oral argument undermine his assertion that veterans' disability benefits should be paid continuously, with a pause only under certain circumstances: (1) the VA may require additional medical exams; (2) the VA may "reconsider" the amount of benefits owed to a veteran based on such "reexaminations"; and (3) the VA can require "reapplication" for the "recommencement" of benefits following a veteran's return from active duty. *See* Maj. Op. at 7–8. According to the majority, the VA's ability to independently discontinue a veteran's benefits award based on these three circumstances demonstrates that "§ 5304(c) does not create a limited exception to a general entitlement to benefits." *Id.*

The majority's reliance on these supposed "concessions" is misplaced. First, our duty is to review judgments, not counsel's comments during oral argument. And, where that judgment was based on statutory interpretation, nothing counsel could say could impact what the statute says, or does not say. Second, there is nothing meaningful about the fact that Mr. Buffington's counsel has no problem with the VA occasionally reassessing the scope of any disability award or with requiring a veteran to notify the VA that his active duty service has ended, just as the veteran is required to notify the VA that his active duty pay recommenced.

While there is no statutory provision granting the VA the right to conduct additional medical exams or to reconsider benefits awards, that authority arises from the VA's obligation to set the percentage of disability in the first instance. 38 C.F.R. § 3.327 states that the VA may require reexaminations whenever it "determines there is a need to verify either the continued existence or the current severity of a disability." 38 C.F.R. § 3.327(a). Though this VA

regulation does not use the word "reconsider," it intimates that the VA may adjust the amount of benefits owed to a veteran if the disability has changed since the initial award. *See id.* ("Generally, reexaminations will be required if it is likely that a disability has improved, or if evidence indicates there has been a material change in a disability or that the current rating may be incorrect."). This provision is unrelated to any pause in payment caused by active duty service.

This regulatory authority does nothing to undermine the notion that veterans' benefits should be continuously paid. Rather, § 3.327(a) simply makes clear that there are two levels of inquiry surrounding entitlement to veterans' benefits: (1) whether the veteran has a service-connected disability that qualifies for benefits; and (2) if so, what the level of disability is for ratings purposes. Section 3.327(a) involves the latter inquiry as it empowers the VA to reassess a veteran's disability for ratings purposes. We are concerned here, by contrast, with the former inquiry. Once a veteran has established a service-connected disability, he is entitled to benefits. Though the benefits ratings level may change depending on the disability, we are concerned here with the continuity of the underlying entitlement. Section 3.327(a) is thus irrelevant to our discussion.

The majority's reliance on the VA's "reapplication" requirement is similarly misplaced. Neither Title 38 nor the corresponding VA regulations speak to reapplying for veterans' benefits. Pursuant to 38 C.F.R. § 3.1(p), claims exist in two forms: (1) an "initial" claim; or (2) a "supplemental" claim. There are three types of initial claims: (1) an original claim, which is the first the VA receives; (2) a new claim for different benefits relating to the veteran's service; and (3) a claim for an increase in the benefit amount for either type of claim. *See id.* §§ 3.1(p)(i)–(ii), 3.160(b). A supplemental claim is filed when a veteran disagrees with a prior VA decision. *See id.* §§ 3.1(p)(2), 3.2501. As discussed above, 38 U.S.C. § 5110(a) ensures that initial and

supplemental claims receive the earliest possible effective start dates. The concept of a veteran "reapplying" for the same benefits to which he was previously entitled does not fit within any of these definitions. And, to the extent 38 C.F.R. § 3.654 requires reapplication vis-à-vis its focus on "recommencement" of benefits, it is contrary to the plain text of §§ 5304(c) and 1131, as discussed above.

What Mr. Buffington's counsel agreed was reasonable is a requirement that the veteran give notice to the VA of the date his active duty service ended so that the VA will know to recommence benefits *as of that date*. This is consistent with how the VA treated Mr. Buffington's notice of his return to active duty. Mr. Buffington notified the VA of his return to service in August 2003. In October 2003, the VA informed Mr. Buffington that his disability compensation was discontinued effective July 20, 2003—the day before his return to active duty. In other words, the VA did not allow his disability pay to continue until it received notice of his change in status; once it received notice, it had no problem backdating the cessation of benefits. Mr. Buffington argues that the VA similarly should have no problem backdating the recommencement of benefits, once it is notified of the date on which a veteran's active duty ceased.

The majority's focus on Mr. Buffington's concessions regarding reexamination, reconsideration, and reapplication is simply unpersuasive. To the extent the VA implements these concepts, they do nothing to rebut the notion that veterans' benefits should be continuously administered but for any period when active duty pay is received.

### C. There is no surplusage concern

The majority finally contends that reading the "any period" language of § 5304(c) to "set both the date for discontinuing benefits and the date for recommencing benefits based on active service" renders § 5112(b)(3) superfluous. Maj. Op. at 8. According to the majority, Congress chose to define the effective date of the discontinuation of benefits

in § 5112(b) but not to specify the effective date of recommencement of disability benefits following a veteran's period of active service. It claims that construing § 5304(c)'s "any period" language as setting the discontinuance and recommencement dates of awards requires reading into the statute a "day-before" discontinuance date and a "day-after" recommencement date. Since Congress already provided a "day-before" discontinuance date in § 5112(b)(3), the majority argues that interpreting "any period" in § 5304(c) to include a "day-before" and a "day-after" effective dates would create impermissible surplusage in § 5112(b)(3).

The majority's argument rests on a misinterpretation of the statutory text. Section 5304(c)'s "any period" language does not create new effective dates. As discussed above, §§ 5110 and 5112(b)(3) do this by establishing start and discontinuance effective dates, respectively. When read alongside § 5112(b)(3), § 5304(c) merely delineates the period of pause in benefits, with § 5112(b)'s discontinuance effective date giving effect to § 5304(c)'s bar on duplicate benefits. It is notable, moreover, that § 5112(b)(3) actually does extra work than the phrase "any period" in § 5304(c): it sets a discontinuance date the *day before* the period in § 5304(c) commences. If anything, the existence of § 5112(b)(3) proves that when Congress wanted to set a commencement or recommencement date that differed from the start and end of the "period" referenced in § 5304(c), it knew how to do so expressly.

## D. Doubt regarding any recommencement date must be resolved in Mr. Buffington's favor

The majority asserts that, because it finds a "statutory gap" regarding the recommencement of benefits, it may ignore the pro-veteran canon of construction in its *Chevron* step one analysis. But that logic does not withstand dissection. What the majority appears to really say is that, by not expressly setting a date for recommencement of

benefits as clearly as it did for a discontinuation of benefits, Congress gave the VA the greenlight to finish the statute via regulation. Calling what it finds a "statutory gap" does not alter the reality of what the majority concludes, however, or what the implications of that conclusion are.

As described above, the majority failed to correctly apply *Chevron*'s step one analysis because it found a statutory gap in § 5304(c) without first finding an ambiguity. As part of a correct *Chevron* step one analysis, the majority must take into account all other traditional canons of construction along the way, including the pro-veteran canon of construction. *Cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) ("*Kisor II*") ("[T]he possibility of deference can arise only if a regulation is genuinely ambiguous. And when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation.").

The majority cites *Terry v. Principi*, 340 F.3d 1378, 1383 (Fed. Cir. 2003) as support for its decision to jettison any discussion of *Brown v. Gardner*, 513 U.S. 115 (1994) and the presumption in favor of veteran-friendly statutory interpretations *Gardner* creates. But *Terry* is materially distinguishable. *Terry* expressly found that the statute at issue was unambiguous; that it was not open to any interpretive doubt once its terms were given their common and ordinary meaning. *See Terry*, 340 F.3d at 1383. It found that Congress gave the VA the right to regulate so as to give effect to that unambiguous statutory scheme.

That is very different from what the majority does here. It does not say that Congress unambiguously required that disability benefits end, rather than pause, and unambiguously authorized the VA to require veterans to go through the onerous disability application process anew merely because they answered the call to return to active duty. It simply finds a silence that needs filling. But, to the extent

there is any silence, it is our job to interpret what that si-
lence means in the first instance, not the VA's.

On the way to resolving that question, to the extent any
interpretive doubt remains, we must apply the *Gardner*
presumption and resolve any ambiguity about what Con-
gress meant in Mr. Buffington's favor.  *See Kisor II*, 139
S. Ct. at 2414; *see also Henderson*, 562 U.S. at 441 ("We
have long applied 'the canon that provisions for benefits to
members of the Armed Services are to be construed in the
beneficiaries' favor.'") (citing *King v. St. Vincent's Hosp.*,
502 U.S. 215, 220–21, n.9 (1991)).  Even if its use is to be
limited to circumstances in which interpretive doubt re-
mains after considering various other tools of construction
during the step one *Chevron* analysis, *see Kisor v.
McDonough*, 995 F.3d 1316 (Fed. Cir. 2021) ("*Kisor IV*"), it
remains an interpretive tool in the court's statutory con-
struction toolbox that is to be employed before resorting to
*Chevron* deference, *see Kisor II*, 139 S. Ct. at 2415
("[B]efore concluding that a rule is genuinely ambiguous, a
court must exhaust all the 'traditional tools' of construc-
tion."); *see also Arangure v. Whitaker*, 911 F.3d 333, 346
(6th Cir. 2018) (noting that the Supreme Court applies a
"canons first" before deference approach to *Chevron*, even
considering policy-based or normative canons at *Chevron*
step one); *see also* Kenneth A. Bamberger, *Normative Can-
ons in the Review of Administrative Policymaking*, 118 Yale
L.J. 64, 77 (2008) ("[C]anons trump deference.").[3]  The ma-
jority cannot avoid addressing the *Gardner* presumption by
avoiding determining whether § 5304(c) is ambiguous.  To
do so is to ignore our job under *Chevron*.  As noted above,

---

[3]    To the extent this court has previously placed con-
sideration of the *Gardner* presumption after considerations
of deference, *Kisor II* made clear that the inquiry is to be
done in the reverse order.

there is nothing ambiguous about the "any period" language in § 5304(c).

## II.

After finding a gap in § 5304(c)'s statutory text, the majority moves on to *Chevron* step two. The majority concludes that 38 C.F.R. § 3.654(b)(2) is a reasonable gap-filling measure because it "incentivizes early filing" of recommencement of benefits, thereby promoting efficiency within the VA. Maj. Op. at 10. But requiring veterans to reapply for benefits to which they previously were entitled seems anything but efficient. If efficiency is paramount, then interpreting § 5304(c) as enacting a pause in benefits for "any period" during which a veteran returns to active duty better achieves that goal.

The majority also reasons that 38 C.F.R. § 3.654(b)(2)'s requirement of "timely reapplication" for benefits is reasonable because a veteran's "disability may improve or worsen over time." *Id.* Impliedly, the "reasonable" functions served by "reapplication" for benefits involve modifying the amount of benefits according to the severity of the veteran's disability.

As noted above, several other regulatory and statutory mechanisms, however, serve these functions. The VA uses reexaminations to monitor the changing levels of a veteran's disability and to adjust the award amount based on the disability rating. *See* 38 C.F.R. § 3.327(a). And, in the event of a veteran's disability worsening, 38 U.S.C. § 5110(b)(3) allows veterans to file claims for increased awards. The means of addressing different disability ratings are thus already baked into the statutory and regulatory framework. They should not muddy our analysis, which focuses on whether 38 C.F.R. § 3.654(b)(2)'s complex benefits scheme comports with the statutory text of Title 38's effective start and discontinuance dates—as well as any pauses pursuant to § 5304(c)'s "any period" language.

Quite simply, 38 C.F.R. § 3.654(b)(2) serves no purpose other than to deny disability benefits (and other critical retirement benefits) to veterans entitled to them solely because these men and women answered the call to return to active duty. That is wholly inconsistent with the beneficent scheme in which the relevant statutory provisions appear and with the congressional intent behind both the VJRA and the AMA. I dissent from the majority's endorsement of this offensive regulation.